UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2004 SEP 30 P 3: 48

CIVIL ACTION NO.

U.S. DISTRICT COURT
DISTRICT OF MASS.

GREGORY F. SANKEY,
Plaintiff

vs.

THE SHAW GROUP INC. and
STONE & WEBSTER, INC.,
Defendants

04 - 12098 RWZ

COMPLAINT
AND
DEMAND FOR JURY TRIAL

MAGISTRATE JUDGE _____

RECEIPT # _____
AMOUNT $ _____ 150
SUMMONS ISSUED yes
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. Tom
DATE 9/30/04

INTRODUCTION

This is a 28 U.S.C. §1332 Diversity of Citizenship Action sounding in Tort, Unfair and

Deceptive Business Practices (the so-called: "Consumer Protection Act" embodied within

Massachusetts General Laws Chapter 93A), and Contract adduced in eight (8) respective Counts:

(1) Deceit/Fraud; (2) Negligent Misrepresentation; (3) Negligent Infliction of Emotional Distress;

(4) Unlawful/Tortious Interference with Advantageous or Contractual Relationship; (5) Civil

Conspiracy; (6) Breach of Contract; (7) Negligence; and, (8) Unfair and Deceptive Business

Conduct. The Plaintiff seeks Two Million ($2,000,000.00) Dollars in single and Six Million

($6,000,000.00) Dollars in multiple/punitive redress and compensation damages for the alleged

tortious, illegal, unconscionable and negligent acts and practices of the above-named Defendants

in causing the Plaintiff, Gregory F. Sankey – without any excuse or justification – to lose an

extremely valuable career opportunity with concomitant, life-altering psychological pain and

suffering.

Page 1 of 21

PARTIES

1.    The Plaintiff, Mr. Gregory F. Sankey (hereinafter termed: "Sankey"), at all times material hereto was a resident of 43 Twiss Road within the Town of Orleans, Barnstable County, Massachusetts, and a citizen of the United States.

2.    The Defendant, The Shaw Group Inc. (hereinafter: "Shaw") is and at all times material hereto was a corporation incorporated pursuant to the laws of the State of Louisiana with a domicile/headquarters address of 4171 Essen Lane, Baton Rouge, Louisiana 70809.

3.    The Defendant, Stone & Webster, Inc. (hereinafter: "Stone") is and at all times material hereto was a business corporation duly incorporated under the laws of the State of Louisiana also with a business headquarters address of 4171 Essen Lane, Baton Rouge, Louisiana 70809, and is a subsidiary corporation of Shaw.

4.    The Defendants, The Shaw Group Inc. and its subsidiary Stone & Webster, Inc. are hereafter referred to as "Shaw".

JURISDICTION

5.    Jurisdiction of this Honorable Court – inter alia – is based upon 28 U.S.C., Section 1332, Diversity of Citizenship, as the amount in controversy well exceeds the sum or value of $75,000.00 exclusive of interests and costs, diversity of citizenship exists between the parties, the Plaintiff resides within the District of Massachusetts and the Defendants at all times material hereto regularly conducted business and effected transactions which critically affected and impaired the rights and opportunities of Mr. Sankey within the Commonwealth of Massachusetts.

BACKGROUND HISTORY AND STATEMENT OF FACTS

6.    From 1973 through mid-2000, Sankey worked for Stone & Webster Engineering

Corporation (hereinafter: "SWEC") at its Boston, Massachusetts office for his

entire 27-year professional career until SWEC declared bankruptcy in the calendar

year 2000 and was purchased by Shaw.

7.    After graduating from college in 1973, Sankey joined SWEC as a Junior

Engineer.  Sankey worked his way up through the multi-tiered engineering ranks

at SWEC and by 1998 Sankey was one of several Vice Presidents within SWEC's

Environmental/Infrastructure (E/I) Division, reporting directly to the head of said

E/I Division.  Two of Sankey's peers at said time were Mr. Thomas Horst

(hereinafter: "Horst") and Mr. William Winkler (hereinafter: "Winkler") who were

both Vice Presidents, long-time colleagues, and who also reported directly to the

head of the E/I Division.

8.    Due to the unexpected death of SWEC's head of Human Resources in 1999,

Sankey was asked by SWEC's executive management to fill the head Human

Resources position.  Sankey accepted said position and thereafter reported to

SWEC's Chairman and CEO and was responsible for supporting some 5,000

Stone employees worldwide.  Horst and Winkler separately resigned from SWEC

sometime after Sankey's promotion to Director of Human Resources, prior to

SWEC declaring bankruptcy and being acquired/purchased by Shaw.

9.    From mid-2000 through December 31, 2000, Sankey continued in his Director of

Human Resources position, working with Shaw pursuant to an employment

contract which Shaw had fully and unconditionally assumed through the afore-
mentioned bankruptcy proceedings. On December 31, 2000, Sankey's Human
Resources position was eliminated and Shaw chose not to extend Sankey's
employment with Shaw.

10.    In January of 2001 Sankey began looking for full-time employment. In February
of 2001, in order to provide income during his job search, Sankey also established
his own consulting engineering business as a sole proprietor.

11.    During the summer of 2001, Horst informed Sankey by telephone that the
Director of (now) Shaw's E/I division had left Shaw. Horst indicated that Horst
was scheduled to be interviewed for said position and asked Sankey for Sankey's
opinion with respect to what Sankey believed would be fair compensation for the
prospective position. Horst also asked Sankey if Sankey would come back to
work with Shaw if Horst accepted the position and was able thereafter to hire
Sankey. Horst further indicated that he was concerned that Shaw had lost
SWEC's best E/I personnel, specifically mentioning Sankey and Winkler, and told
Sankey that he would need both Sankey and Winkler back (i.e. – to work with
Horst) in order to be successful. Horst further informed Sankey that Sankey's
answer would be a factor in his decision to accept the Director position. Sankey
told Horst that he was interested in coming back to work at/with Shaw if indeed
Horst became the Director of its E/I Division. Horst further stated that he would
keep Sankey informed and updated with respect to the prospect of hiring Sankey.

12.    On or about September 10, 2001, Horst telephoned Sankey and informed Sankey

that Horst was now the Vice President and Director of Shaw's E/I Division and that as such he was based in Shaw's Stoughton, Massachusetts Office. Horst told Sankey that he had just hired back Winkler as his (Shaw's E/I Division) Vice President of Marketing and asked if Sankey would come back to work as his (Shaw's E/I Division) Vice President of Operations. Horst said that Sankey would complement and complete his senior management team (i.e. – Horst, Winkler, Sankey). Horst stated that he had told Walter R. Rhodes (hereinafter: "Rhodes"), a Shaw Senior Vice President, head of Shaw's Stoughton, Massachusetts Office and Horst's boss, that he wanted to hire Sankey back. Horst said that Rhodes "checked out" Sankey and told Horst to work out an agreement and hire Sankey. Horst said that Rhodes stated that he met Sankey when Shaw was purchasing SWEC through the bankruptcy proceedings and saw no need for an interview. Horst further stated that he was currently busy with a proposal to clean up New Bedford (Massachusetts) Harbor and asked if he could meet with Sankey in a few weeks to discuss Sankey's compensation package. Sankey and Horst agreed to meet whenever it was convenient for Horst.

13.    In September of 2001, Mr. Joseph D. Cleggett (hereinafter: "Cleggett"), Vice President and Eastern Regional Manager of Sverdrup Civil, Inc., a subsidiary of Jacobs Engineering Group Inc. (hereinafter: "Jacobs"), asked Sankey if he would come to work for Jacobs as its Boston Office Manager. Sankey and Cleggett agreed to have lunch on October 11, 2004 to finalize compensation.

14.    On or about October 5, 2001 Sankey and Horst met in Stoughton, Massachusetts

to discuss Sankey's compensation package with Shaw. Horst proposed the following:

1.     Annual Base Salary: Must be under $200,000 if even by one dollar;

2.     Sign-on Bonus: $30,000;

3.     Vacation: 4 weeks;

4.     Title: Vice President, Operations, Environmental/Infrastructure;

5.     Use of a Company vehicle; and,

6.     Eligible for stock options and annual bonus.

Sankey told Horst that he had another job opportunity to consider. Horst either knew or correctly guessed that Sankey's other job opportunity was with Jacobs. Horst told Sankey to take whichever offer was best for Sankey; however, Horst stated that Jacobs could not match Shaw's offer. Sankey told Horst that he had a meeting scheduled with Jacobs on October 11, 2001 and that he would then decide which job offer to accept and subsequently contact Horst by telephone.

15.     On or about October 8, 2001, Sankey telephoned Cleggett at Jacobs to discuss their offer in more detail. Cleggett outlined the following offer from Jacobs:

1.     Annual Base Salary: $156,000;

2.     Vacation: 2 weeks;

3.     Title: Boston Office Manager; and,

4.     Annual Bonus estimated between $10,000 and $15,000.

Sankey rejected the Jacobs offer and told Cleggett that he was going to accept Shaw's offer. Accordingly, the meeting scheduled for October 11, 2001 between

Sankey and Cleggett (for Jacobs) was cancelled.

16.    On or about October 9, 2001 Sankey telephoned Horst and stated that he had rejected the Jacobs opportunity in favor of Shaw's offer. Horst was clearly pleased and indicated that he wanted Sankey to meet with Rhodes since this was the routine that Horst followed when he hired Winkler.

17.    On or about October 24, 2001, Sankey and Rhodes met at Shaw's Stoughton, Massachusetts Office. During their meeting, Rhodes: (a) confirmed that Sankey's job was "Vice President, Operations, Environmental/Infrastructure Division"; (b) stated that he had "checked out" Sankey and nobody had a problem with Sankey coming back; (c) confirmed that he had the authority to hire Sankey; (d) said that he already gave his approval to Horst to hire Sankey because Rhodes' job was to support Horst with whatever Horst needed – and that he had even told Horst that their meeting was not necessary; (e) said that he was hopeful that Sankey could be available to start work in a week or so; and (f) said that Horst would call Sankey shortly to finalize the offer.

18.    On or about October 25, 2001, Horst called Sankey and told him that Rhodes was impressed with Sankey's operations experience. Horst told Sankey that Rhodes told him to get the Shaw offer out to Sankey. Horst said that he would put the offer in writing and have Sankey agree to the wording before sending the final signed letter because he wanted only one signed letter in the file. Horst then said that he and Rhodes had agreed that Sankey's annual base salary would be $185,000. Sankey told Horst that, based on Horst's October 5, 2001 proposal

Sankey had been expecting a salary closer to $200,000. At Sankey's suggestion Horst agreed to consider splitting the difference at $192,000.

19.   On or about October 28, 2001, in the interest of saving time, Sankey e-mailed proposed wording to Horst for Horst to consider using in the offer letter (See, true copy of said e-mail attached hereto and incorporated herein as Exhibit 1).

20.   On or about October 30, 2001 Horst informed Sankey that he was uncomfortable with $192,000 because Sankey's total compensation package would be better than his, and this could also create a problem with Winkler. Sankey told Horst that the last thing Sankey wanted to do was to create a problem for Horst and that he was pleased to accept an annual salary of $185,000. Horst was pleased and told Sankey that Sankey had "just made a lot of people happy."

21.   As of October 30, 2001 Shaw (Horst, with Rhodes approval) made a clear and definite job offer to Sankey, addressing all material aspects of the offer and Sankey's position. Sankey accepted, thus forming a consummated employment contract between Sankey and Shaw.

22.   On or about October 30, 2001 Horst wrote up the agreed-upon offer in the form of a draft letter and e-mailed it to Sankey (See, true copy of said e-mail attached hereto and incorporated herein as Exhibit 2). Sankey reviewed the draft letter and discovered a $5,000 error in his favor as Shaw included a $35,000 sign-on bonus instead of the agreed-upon $30,000 amount. Sankey e-mailed the revised draft letter back to Horst and informed him that the indicated sign-on bonus was higher than the agreed-upon amount (See, true copy of said e-mail attached hereto and

incorporated herein as <u>Exhibit 3</u>).

23.    On or about October 31, 2001 Horst lowered the sign-on bonus to the agreed-upon $30,000 amount, made a working change regarding the Company vehicle, and e-mailed it back to Sankey (<u>See</u>, true copy of said e-mail attached hereto and incorporated herein as <u>Exhibit 4</u>). As of October 31, 2001 all material aspects of the contract between Sankey and Shaw were agreed upon in writing.

24.    On or about October 31 to November 2, 2001, Sankey and Horst corresponded by e-mail (<u>See</u>, true copy of said e-mail attached hereto and incorporated herein as <u>Exhibit 5</u>) and telephone regarding wording for the prospective Sankey job vehicle. Horst said that the wording was a non-issue and that there was no problem because Sankey had told him up front which vehicle he wanted and Horst had agreed. Horst concluded discussions on this topic by stating that he would use Sankey's wording. Horst said that the final letter would be mailed "within a day or two." As of November 2, 2001 Sankey's employment contract was completely agreed upon in writing.

25.    On or about November 7, 2001, Sankey had not received the final letter from Shaw as had been promised by Horst and as Sankey expected. Since Sankey was going to be away from his office for two days and believed that Shaw was anxious for him to start work, Sankey e-mailed Horst with instructions regarding how Horst could reach Sankey (<u>See</u>, true copy of said e-mail attached hereto and incorporated herein as <u>Exhibit 6</u>).

26.    On or about November 9, 2001, Sankey returned to his office and found no final

letter or response to his November 7, 2001 e-mail. Therefore, Sankey sent another e-mail to Horst (See, true copy of said e-mail attached hereto and incorporated herein as Exhibit 7), and Horst responded by e-mail that Rhodes told Horst that Rhodes had to talk with Charlie Moore (See, true copy of said e-mail attached hereto and incorporated herein as Exhibit 8).

27.    On or about November 15, 2001, Horst called Sankey and stated that Rhodes told him to delay Sankey just one more week in accord with instructions from Shaw's corporate management located in Baton Rouge, Louisiana. Horst informed Sankey that everything was "OK" (See, "Notes of Telephone Conversation between Sankey & Shaw" attached hereto and incorporated herein as Exhibit 9).

28.    On or about November 30, 2001, Horst called Sankey and left a message on Sankey's answering machine that Rhodes would be in Baton Rouge the following week and would resolve the situation (See, "Notes of Telephone Conversation between Sankey & Shaw" attached hereto and incorporated herein as Exhibit 10).

29.    On or about December 3, 2001, Horst called Sankey and left a message on Sankey's answering machine that – with or without resolution while in Baton Rouge that week – Rhodes would send the final letter to Sankey when Rhodes returned to his Stoughton, Massachusetts Office (See, "Notes of Telephone Conversation between Sankey & Shaw" attached hereto and incorporated herein as Exhibit 11).

30.    On or about December 11, 2001, Horst called Sankey and stated that the final letter would be out "today or tomorrow", that Rhodes told him the delay was due

to unrelated matters that took his attention, and that Horst was going on vacation and would return after the first of the year (See, "Notes of Telephone Conversation between Sankey & Shaw" attached hereto and incorporated herein as Exhibit 12).

31.    On or about January 7, 2002, Sankey sent an e-mail to Horst stating that it had been three months since they agreed on Sankey coming back to work at Shaw; that the final written letter had been agreed-upon more than two months ago; that Sankey was being tortured; and, that Sankey was being financially impacted (See, true copy of said e-mail attached hereto and incorporated herein as Exhibit 13).

32.    On or about January 8, 2002, Horst acknowledged Sankey's January 7, 2002 e-mail and asked Sankey to call him (See, true copy of said e-mail attached hereto and incorporated herein as Exhibit 14A).  Sankey telephoned Horst  who said that he agreed with Sankey's January 7, 2002 e-mail and was totally embarrassed, but Horst insisted that it was not a dead issue.  Horst then suggested that they wait a few more weeks and Sankey agreed (See, "Notes of Telephone Conversation between Sankey & Shaw" attached hereto and incorporated herein as Exhibit 14B).

33.    On or about February 15, 2002, after waiting five more weeks without any word from Shaw, Sankey sent a letter to Rhodes stating that Sankey suffered damages caused by Shaw, and proposed a settlement (See, true copy of said correspondence attached hereto an incorporated herein as Exhibit 15A).  At this time the Jacobs job was no longer available to Sankey. (See, true copy of September 5, 2004

<u>Affidavit of Joseph D. Cleggett</u> attached hereto and incorporated herein as <u>Exhibit 15B</u>.)

34.    On or about March 12, 2002, Rhodes sent a letter responding to Sankey in which he stated that Sankey was never offered a job and he therefore declined Sankey's offer of settlement (<u>See</u>, true copy of said correspondence attached hereto and incorporated herein as <u>Exhibit 16</u>).

35.    On or about March 29, 2002, Sankey's attorney (at that time) sent a demand letter to Rhodes advising that Sankey was caused significant damage by Shaw and that unless Shaw made a reasonable offer of settlement, Sankey intended to commence formal proceedings against Shaw (<u>See</u>, true copy of said demand correspondence attached hereto and incorporated herein as <u>Exhibit 17</u>).  Shaw did not respond to Sankey's Attorney's demand letter of March 29, 2002 and has never responded to same in writing to date.

36.    As the direct and proximate result of the actions and conduct of the Defendants as outlined in detail above, Sankey was clearly and reasonably led to believe that he had secured a lucrative position with the Defendants, and having been so assured on numerous occasions and relying to his great detriment and harm upon the Defendants' negligent and/or intentionally unfair and deceptive course of conduct, Sankey not only was deprived of the job opportunity he knew he had "secured" with the Defendants but also turned down a highly lucrative, comparable position with Jacobs and accordingly has suffered and will continue to suffer great monetary damages and economic harm no less than One Million Seven Hundred

and Fifty Thousand ($1,750,000.00) Dollars.

37.    Moreover, as a direct and proximate result of the unfair and deceptive course of conduct inflicted upon Sankey by the Defendants Sankey has suffered emotional and psychological pain and suffering which may be reasonably assessed – given the impact of the Defendants' conduct upon Sankey's quality of life – to be valued at Two Hundred and Fifty Thousand ($250,000.00) Dollars.

38.    Presently Sankey continues his own consulting engineering business as a sole proprietor.

39.    Sankey's average income from his consulting engineering business for 2002 (actual), 2003 (actual) and 2004 (estimated) is approximately $56,000.00 per year.

40.    Had Sankey accepted the Jacobs job opportunity, Sankey's annual compensation (income plus benefits) would have been approximately $180,000.00 per year.

41.    Sankey diligently continues on an ongoing basis to look for other job opportunities more beneficial than his consulting engineering business, but to date has not secured any other such opportunities.

42.    As a result of Sankey's reasonable reliance on Shaw's promises, Sankey continues to suffer a loss of approximately $124,000.00 per year (i.e. – $180,000.00 less $56,000.00).

43.    Sankey had intended to remain at Jacobs from October 31, 2001 until at least his normal retirement date of August 24, 2015, a period of 13.8 years, consistent with his history of service to one employer for his prior entire 27-year professional engineering career.

## COUNT I – DECEIT/FRAUD

44.    The Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 43 with the same force and effect as though fully set forth herein.

45.    By their improper, fraudulent and illegal acts complained of herein the Defendants misrepresented facts to the Plaintiff with the intention to induce the Plaintiff to act upon said misrepresented facts, said Defendants knew of the untruth of their misrepresentations and further failed to disclose facts to the Plaintiff which they had a duty to disclose and said Defendants intended that their misrepresentations be acted upon by the Plaintiff as they were and the Plaintiff has sustained damages directly as a result of said misrepresentations in the amount of One Million Seven Hundred and Fifty Thousand ($1,750,000.00) Dollars.

WHEREFORE, THE PLAINTIFF DEMANDS JUDGMENT AGAINST THE DEFENDANTS IN THE AMOUNT OF ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND ($1,750,000.00) DOLLARS TOGETHER WITH INTEREST AND ALL COSTS OF THIS ACTION.

## COUNT II - NEGLIGENT MISREPRESENTATION

46.    The Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 45 with the same force and effect as though fully set forth herein.

47.    By their improper, fraudulent, illegal and deceptive acts complained of herein, the Defendants negligently misrepresented facts to the Plaintiff with the intention

and/or the obvious effect of inducing the Plaintiff to act upon said negligently misrepresented facts, said Defendants knew or should have known under all the facts and circumstances at bar of the untruth of their misrepresentations, and said Defendants further failed to disclose facts to the Plaintiff which they knew or should have known they had a duty to disclose, and said Defendant intended or should have known that their misrepresentations would be acted upon by the Plaintiff precisely as they were, and the Plaintiff sustained damages as a result of said negligent misrepresentations in the amount of One Million Seven Hundred and Fifty Thousand ($1,750,000.00) Dollars.

WHEREFORE, THE PLAINTIFF DEMANDS JUDGMENT AGAINST THE DEFENDANTS IN THE AMOUNT OF ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND ($1,750,000.00) DOLLARS TOGETHER WITH INTEREST AND ALL COSTS OF THIS ACTION.

## COUNT III - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

48.    The Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 47 with the same force and effect as though fully set forth herein.

49.    As the direct result of the Defendants' abusive, willful, callous, unfair, deceptive, outrageous and intentionally misleading conduct complained of herein, the Plaintiff has inescapably suffered extreme and marked emotional and physical distress.

WHEREFORE, THE PLAINTIFF DEMANDS JUDGMENT AGAINST THE

DEFENDANTS IN THE AMOUNT OF ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND ($1,750,000.00) DOLLARS IN ACTUAL, MONETARY LOSSES AND TWO HUNDRED AND FIFTY THOUSAND ($250,000.00) DOLLARS FOR EMOTIONAL PAIN AND SUFFERING, OR, TWO MILLION ($2,000,000.00) DOLLARS TOGETHER WITH INTEREST AND ALL COSTS OF THIS ACTION.

<u>COUNT IV – UNLAWFUL/TORTIOUS INTERFERENCE WITH ADVANTAGEOUS OR CONTRACTUAL RELATIONSHIP</u>

50.   The Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 49 with the same force and effect as though fully set forth herein.

51.   As the result of the Defendants' knowing, intentional and improper interference with the Plaintiff's contractual or other economic relationship with Jacobs resulting in acute monetary loss and damages to the Plaintiff and clear interference with the Plaintiff's prospective economic relationship with Jacobs the Plaintiff has suffered monetary damages and emotional distress as a direct result of said Defendants' willful and unlawful interference with the Plaintiff's contractual relations.

WHEREFORE, THE PLAINTIFF DEMANDS JUDGMENT AGAINST THE DEFENDANTS IN THE SUM OF ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND ($1,750,000.00) DOLLARS COMPRISING ACTUAL MONETARY LOSSES RESULTING FROM THE DEFENDANTS' ILLICIT CONDUCT TOGETHER WITH TWO HUNDRED AND FIFTY THOUSAND ($250,000.00) FOR EMOTIONAL DISTRESS, OR,

TWO MILLION ($2,000,000.00) DOLLARS TOGETHER WITH INTEREST AND ALL
COSTS OF THIS ACTION.

## COUNT V – CIVIL CONSPIRACY

52.    The Plaintiff repeats, realleges and incorporates by reference each and every
       allegation contained in Paragraphs 1 through 51 with the same force and effect as
       though fully set forth herein.

53.    The Defendants, in bad faith, and in an unfair, deceptive, fraudulent, corrupt and
       illegal manner combined to accomplish, and conspired together for, the purpose of
       achieving the economic and emotionally distressing result effected upon the
       Plaintiff by their unlawful combination and as a direct result thereof the Plaintiff
       has sustained economic damages in the sum of One Million Seven Hundred and
       Fifty Thousand ($1,750,000.00) Dollars.

WHEREFORE, THE PLAINTIFF DEMANDS JUDGMENT AGAINST THE
DEFENDANTS IN THE SUM OF ONE MILLION SEVEN HUNDRED AND FIFTY
THOUSAND ($1,750,000.00) DOLLARS TOGETHER WITH INTEREST AND ALL COSTS
OF THIS ACTION.

## COUNT VI - BREACH OF CONTRACT

54.    The Plaintiff repeats, realleges and incorporates by reference each and every
       allegation contained in Paragraphs 1 through 53 with the same force and effect as
       though fully set forth herein.

55.    Notwithstanding the fact that the Plaintiff fully performed each and every task,
       duty or obligation required on his part pursuant to the agreement between himself

and the Defendants, the Defendants without any excuse or justification materially breached the agreement and contract between the parties to the Plaintiff's great economic harm.

WHEREFORE, THE PLAINTIFF DEMANDS JUDGMENT AGAINST THE DEFENDANTS IN THE SUM OF HIS ACTUAL MONETARY DAMAGES, OR, ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND ($1,750,000.00) DOLLARS TOGETHER WITH INTEREST AND ALL COSTS OF THIS ACTION.

<u>COUNT VII - NEGLIGENCE</u>

56.    The Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 55 with the same force and effect as though fully set forth herein.

57.    As the direct and proximate cause of the negligence of the Defendants the Plaintiff was caused to sustain severe economic and monetary losses. The Defendants as complained of herein were negligent in their course of conduct with the Plaintiff; in leading the Plaintiff to reasonably believe that he had been hired by the Defendants; in allowing the Plaintiff to lose an extremely lucrative alternative economic job opportunity and package which the Defendants were well aware of; and, in their unfair and deceptive manner throughout in dealing with the Plaintiff – to his great harm.

WHEREFORE, THE PLAINTIFF DEMANDS JUDGMENT AGAINST THE DEFENDANTS IN THE AMOUNT OF ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND ($1,750,000.00) DOLLARS TOGETHER WITH INTEREST AND ALL COSTS

OF THIS ACTION.

### COUNT VIII - UNFAIR AND DECEPTIVE BUSINESS CONDUCT

### PURSUANT TO MASSACHUSETTS GENERAL LAWS

### CHAPTER 93A, SECTION 11

58.    The Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 57 with the same force and effect as though fully set forth herein.

59.    The unfair and deceptive business conduct of the Defendants – as detailed and documented herein, was a willful and knowing violation of the law on their part without excuse or justification and, moreover, because of the Defendants' unwillingness to respond to the Plaintiff's reasonable demand of March 29, 2002 tendered by and through his attorney at the time, one Anthony A. Froio of ROBINS, KAPLAN, MILLER & CIRESI (See, true copy of said Demand Correspondence attached hereto and incorporated herein as Exhibit 17), the Plaintiff has been required to institute costly and protracted litigation.

WHEREFORE, THE PLAINTIFF DEMANDS:

A.    THAT JUDGMENT BE ENTERED AGAINST THE DEFENDANTS FOR THE SUM OF TWO MILLION ($2,000,000.00) DOLLARS, THAT AMOUNT BEING THE COMBINATION OF ACTUAL MONETARY DAMAGES SUFFERED BY THE PLAINTIFF TOGETHER WITH EMOTIONAL DISTRESS DAMAGES (IN THE RESPECTIVE AMOUNTS OF ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND ($1,750,000.00)

DOLLARS AND TWO HUNDRED AND FIFTY THOUSAND ($250,000.00)

DOLLARS) AS A RESULT OF THE UNFAIR AND DECEPTIVE ACTS AND

PRACTICES COMPLAINED OF HEREIN;

B.    THAT THE PLAINTIFF BE AWARDED PUNITIVE DAMAGES IN

THE AMOUNT OF THREE TIMES HIS ACTUAL DAMAGES OUTLINED

IMMEDIATELY ABOVE, OR, SIX MILLION ($6,000,000.00) DOLLARS;

C.    THAT THE PLAINTIFF BE AWARDED REASONABLE ATTORNEY'S

FEES AND ALL COSTS INCURRED IN THIS OTHERWISE UNNECESSARY

ACTION; AND,

D.    THAT THE PLAINTIFF BE AWARDED SUCH OTHER RELIEF AS IS

FAIR AND EQUITABLE UNDER ALL THE FACTS AND CIRCUMSTANCES

AT BAR.

---

### PLAINTIFF'S DEMAND FOR TRIAL FOR JURY

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, RULE 38, THE

PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY OF ALL ISSUES IN THIS ACTION

TRIABLE OF RIGHT BY A JURY.

---

Plaintiff, Gregory F. Sankey
By his Attorney,

Anthony R. Bott, Esq.
BBO # 040450
Anthony R. Bott, P.C.
Eight Beach Road
P.O. Box 1137
East Orleans, MA 02643
(508) 240-2700

Dated: 7/30/2004