UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.:  04-12098 RWZ

GREGORY F. SANKEY,
  Plaintiff                          )
                                     )
                                     )
vs.                                  )
                                     )
                                     )      **AMENDED COMPLAINT**
                                     )            **AND**
THE SHAW GROUP INC. and              )      **DEMAND FOR JURY TRIAL**
STONE & WEBSTER, INC.,               )
  Defendants                         )
                                     )
                                     )

## INTRODUCTION

This is a 28 U.S.C. §1332 Diversity of Citizenship Action sounding in Tort, Unfair and Deceptive Business Practices (the so-called: "Consumer Protection Act" embodied within M.G.L. c. 93A §§ 2 & 11 - inter alia, Contract and the Massachusetts Civil Rights Act, M.G.L. c. 12 §§ 11 H & I, adduced in twelve (12) respective Counts: (1) Deceit/Fraud; (2) Negligent Misrepresentation; (3) Negligent Infliction of Emotional Distress;  (4) Unlawful/Tortious Interference with Advantageous or Contractual Relationship; (5) Civil Conspiracy; (6) Breach of Contract; (7) Negligence; (8) Breach of the Implied Covenant of Good Faith and Fair Dealing; (9) Violation of the Massachusetts Civil Rights Act, M.G.L. c. 12, §§ 11H & I; (10) Promissory Estoppel; (11) Economic Duress; and, (12) Unfair and Deceptive Business Conduct Pursuant to Massachusetts General Laws Chapter 93A §§ 2 & 11 (inter alia).  The Plaintiff seeks Two Million ($2,000,000.00) Dollars in single and Six Million ($6,000,000.00) Dollars in multiple/ punitive redress and compensation damages for the alleged tortious, illegal, unconscionable and

negligent acts and practices of the above-named Defendants in causing the Plaintiff, Gregory F. Sankey – without any excuse or justification – to lose an extremely valuable career opportunity with concomitant, life-altering psychological pain and suffering.

<u>PARTIES</u>

1. The Plaintiff, Mr. Gregory F. Sankey (hereinafter termed: "Sankey"), at all times material hereto was a resident of 43 Twiss Road within the Town of Orleans, Barnstable County, Massachusetts, and a citizen of the United States.

2. The Defendant, The Shaw Group Inc., is and at all times material hereto was a corporation incorporated pursuant to the laws of the State of Louisiana with a domicile/headquarters address of 4171 Essen Lane, Baton Rouge, Louisiana 70809.

3. The Defendant, Stone & Webster, Inc., is and at all times material hereto was a business corporation duly incorporated under the laws of the State of Louisiana also with a business headquarters address of 4171 Essen Lane, Baton Rouge, Louisiana 70809, and is a subsidiary corporation of Shaw.

4. The Defendants, The Shaw Group Inc. and its subsidiary Stone & Webster, Inc. are hereafter referred to as "Shaw".

<u>JURISDICTION</u>

5. Jurisdiction of this Honorable Court – inter alia – is based upon 28 U.S.C., Section 1332, Diversity of Citizenship, as the amount in controversy well exceeds the sum or value of $75,000.00 exclusive of interests and costs, diversity of citizenship exists between the parties, the Plaintiff resides within the District of

Massachusetts and the Defendants at all times material hereto regularly conducted business and effected transactions which critically affected and impaired the rights and opportunities of Mr. Sankey within the Commonwealth of Massachusetts.

## BACKGROUND HISTORY AND STATEMENT OF FACTS

6.    From 1973 through mid-2000, Sankey worked for Stone & Webster Engineering Corporation (hereinafter: "SWEC") at its Boston, Massachusetts office for his entire 27-year professional career until SWEC declared bankruptcy in the calendar year 2000 and was purchased by Shaw.

7.    After graduating from college in 1973, Sankey joined SWEC as a Junior Engineer.  Sankey worked his way up through the multi-tiered engineering ranks at SWEC and by 1998 Sankey was one of several Vice Presidents within SWEC's Environmental/Infrastructure (E/I) Division, reporting directly to the head of said E/I Division.  Two of Sankey's peers at said time were Mr. Thomas Horst (hereinafter: "Horst") and Mr. William Winkler (hereinafter: "Winkler") who were both Vice Presidents, long-time colleagues, and who also reported directly to the head of the E/I Division.

8.    Due to the unexpected death of SWEC's head of Human Resources in 1999, Sankey was asked by SWEC's executive management to fill the head Human Resources position.  Sankey accepted said position and thereafter reported to SWEC's Chairman and CEO and was responsible for supporting some 5,000 SWEC employees worldwide.  Horst and Winkler separately resigned from SWEC sometime after Sankey's promotion to Director of Human Resources, and

prior to SWEC declaring bankruptcy and being acquired/purchased by Shaw in mid-2000.

9.    From mid-2000 through December 31, 2000, Sankey continued in his Director of Human Resources position, working with Shaw pursuant to an employment contract which Shaw had fully and unconditionally assumed through the afore-mentioned bankruptcy proceedings.  On December 31, 2000, Sankey's Human Resources position was eliminated and Shaw chose not to extend Sankey's employment with Shaw.

10.   In January of 2001 Sankey began looking for full-time employment.  In February of 2001, in order to provide income during his job search, Sankey also established his own consulting engineering business in the State of Massachusetts, furnishing services as a sole proprietor.

11.   During the summer of 2001, Horst informed Sankey by telephone that the Director of (now) Shaw's E/I Division had left Shaw.  Horst indicated that Horst was scheduled to be interviewed for said position and asked Sankey for Sankey's opinion with respect to what Sankey believed would be fair compensation for the prospective position.  Horst also asked Sankey if Sankey would come back to work with Shaw if Horst accepted the position and was able thereafter to hire Sankey.  Horst further indicated that he was concerned that Shaw had lost SWEC's best E/I personnel, specifically mentioning Sankey and Winkler, and told Sankey that he would need both Sankey and Winkler back (i.e. – to work with Horst) in order to be successful.  Horst further informed Sankey that Sankey's

answer would be a factor in Horst's decision to accept the Director position with Shaw. Sankey told Horst that he was interested in coming back to work at/with Shaw if indeed Horst became the Director of its E/I Division. Horst further stated that he would keep Sankey informed and updated with respect to the prospect of hiring Sankey.

12.     On or about September 10, 2001, Horst telephoned Sankey and informed Sankey that Horst was now the Vice President and Director of Shaw's E/I Division and that as such he was based in Shaw's Stoughton, Massachusetts Office. Horst told Sankey that he had just hired back Winkler as his (Shaw's E/I Division) Vice President of Marketing and asked if Sankey would come back to work as his (Shaw's E/I Division) Vice President of Operations. Horst said that Sankey would complement and complete his senior management team (i.e. – Horst, Winkler, Sankey). Horst stated that he had told Walter R. Rhodes (hereinafter: "Rhodes"), a Shaw Senior Vice President, head of Shaw's Stoughton, Massachusetts Office and Horst's boss, that he wanted to hire Sankey back. Horst said that Rhodes "checked out" Sankey and told Horst to work out an agreement and hire Sankey. Horst said that Rhodes stated that he met Sankey when Shaw was purchasing SWEC through the bankruptcy proceedings and saw no need for an interview. Horst further stated that he was currently busy with a proposal to clean up New Bedford (Massachusetts) Harbor and asked if he could meet with Sankey in a few weeks to discuss Sankey's compensation package. Sankey and Horst agreed to meet whenever it was convenient for Horst.

13.    In September of 2001, Mr. Joseph D. Cleggett (hereinafter: "Cleggett"), Vice President and Eastern Regional Manager of Sverdrup Civil, Inc., a subsidiary of Jacobs Engineering Group Inc. (hereinafter: "Jacobs"), asked Sankey if he would come to work for Jacobs as its Boston Office Manager. Sankey and Cleggett agreed to have lunch on October 11, 2004 to finalize compensation.

14.    On or about October 5, 2001 Sankey and Horst met in Stoughton, Massachusetts to discuss Sankey's compensation package with Shaw. Horst proposed the following:

1.    Annual Base Salary: Must be under $200,000 if even by one dollar;

2.    Sign-on Bonus: $30,000;

3.    Vacation: 4 weeks;

4.    Title: Vice President, Operations, Environmental/Infrastructure Division;

5.    Use of a Company vehicle; and,

6.    Eligible for stock options and annual bonus.

Sankey told Horst that he had another job opportunity to consider. Horst either knew or correctly guessed that Sankey's other job opportunity was with Jacobs. Horst told Sankey to take whichever offer was best for Sankey; however, Horst stated that Jacobs could not match Shaw's offer. Sankey told Horst that he had a meeting scheduled with Jacobs on October 11, 2001 and that he would then decide which job offer to accept and subsequently contact Horst by telephone.

15.    On or about October 8, 2001, Sankey telephoned Cleggett at Jacobs to discuss their offer in more detail. Cleggett outlined the following offer from Jacobs:

1.    Annual Base Salary: $156,000;

2.    Vacation: 2 weeks;

3.    Title: Boston Office Manager; and,

4.    Annual Bonus estimated between $10,000 and $15,000.

Sankey rejected the Jacobs offer and told Cleggett that he was going to accept Shaw's offer. Accordingly, the meeting scheduled for October 11, 2001 between Sankey and Cleggett (for Jacobs) was cancelled.

16.    On or about October 9, 2001 Sankey telephoned Horst and stated that he had rejected the Jacobs opportunity in favor of Shaw's offer. Horst was clearly pleased and indicated that he wanted Sankey to meet with Rhodes since this was the routine that Horst followed when he hired Winkler.

17.    On or about October 24, 2001, Sankey and Rhodes met at Shaw's Stoughton, Massachusetts Office. During their meeting, Rhodes: (a) confirmed that Sankey's job was "Vice President, Operations, Environmental/Infrastructure Division"; (b) stated that he had "checked out" Sankey and nobody had a problem with Sankey coming back; (c) confirmed that he had the authority to hire Sankey; (d) said that he already gave his approval to Horst to hire Sankey because Rhodes' job was to support Horst with whatever Horst needed – and that he had even told Horst that it was not necessary for Rhodes and Sankey to meet; (e) said that he was hopeful that Sankey could be available to start work in a week or so; and (f) said that Horst would call Sankey shortly to finalize the offer.

18.    On or about October 25, 2001, Horst called Sankey and told him that Rhodes was

impressed with Sankey's operations experience. Horst told Sankey that Rhodes told him to get the Shaw offer out to Sankey. Horst said that he would put the offer in writing and have Sankey agree to the wording before sending the final signed letter because he wanted only one signed letter in the file. Horst then said that he and Rhodes had agreed that Sankey's annual base salary would be $185,000. Sankey told Horst that, based on Horst's October 5, 2001 proposal Sankey had been expecting a salary closer to $200,000. At Sankey's suggestion Horst agreed to consider splitting the difference at $192,000.

19.   On or about October 28, 2001, in the interest of saving time, Sankey e-mailed proposed wording to Horst for Horst to consider using in the offer letter (See, true copy of said e-mail attached hereto and incorporated herein as Exhibit 1).

20.   On or about October 30, 2001 Horst informed Sankey that he was uncomfortable with $192,000 because Sankey's total compensation package would be better than his, and this could also create a problem with Winkler. Sankey told Horst that the last thing Sankey wanted to do was to create a problem for Horst and that he was pleased to accept an annual salary of $185,000. Horst was pleased and told Sankey that Sankey had "just made a lot of people happy."

21.   As of October 30, 2001 Shaw (Horst, with Rhodes approval) made a clear and definite job offer to Sankey, addressing all material aspects of the offer and Sankey's position. Sankey accepted, thus forming a consummated employment contract between Sankey and Shaw.

22.   On or about October 30, 2001 Horst wrote up the agreed-upon offer in the form of

a draft letter and e-mailed it to Sankey (See, true copy of said e-mail attached hereto and incorporated herein as Exhibit 2). Sankey reviewed the draft letter and discovered a $5,000 error in his favor as Shaw included a $35,000 sign-on bonus instead of the agreed-upon $30,000 amount. Sankey e-mailed the revised draft letter back to Horst and informed him that the indicated sign-on bonus was higher than the agreed-upon amount (See, true copy of said e-mail attached hereto and incorporated herein as Exhibit 3).

23. On or about October 31, 2001 Horst lowered the sign-on bonus to the agreed-upon $30,000 amount, made a working change regarding the Company vehicle, and e-mailed it back to Sankey (See, true copy of said e-mail attached hereto and incorporated herein as Exhibit 4). As of October 31, 2001 all material aspects of the contract between Sankey and Shaw were agreed upon in writing.

24. On or about October 31 to November 2, 2001, Sankey and Horst corresponded by e-mail (See, true copy of said e-mail attached hereto and incorporated herein as Exhibit 5) and telephone regarding wording for the prospective Sankey job vehicle. Horst said that the wording was a non-issue and that there was no problem because Sankey had told him up front which vehicle he wanted and Horst had agreed. Horst concluded discussions on this topic by stating that he would use Sankey's wording. Horst said that the final letter would be mailed "within a day or two." As of November 2, 2001 Sankey's employment contract was completely agreed upon in writing.

25. On or about November 7, 2001, Sankey had not received the final letter from

Shaw as had been promised by Horst and as Sankey expected. Since Sankey was going to be away from his office for two days and believed that Shaw was anxious for him to start work, Sankey e-mailed Horst with instructions regarding how Horst could reach Sankey (See, true copy of said e-mail attached hereto and incorporated herein as Exhibit 6).

26. On or about November 9, 2001, Sankey returned to his office and found no final letter or response to his November 7, 2001 e-mail. Therefore, Sankey sent another e-mail to Horst (See, true copy of said e-mail attached hereto and incorporated herein as Exhibit 7), and Horst responded by e-mail that Rhodes told Horst that Rhodes had to talk with Charlie Moore (See, true copy of said e-mail attached hereto and incorporated herein as Exhibit 8).

27. On or about November 15, 2001, Horst called Sankey and stated that Rhodes told him to delay Sankey just one more week in accord with instructions from Shaw's corporate management located in Baton Rouge, Louisiana. Horst informed Sankey that everything was "OK" (See, "Notes of Telephone Conversation between Sankey & Shaw" attached hereto and incorporated herein as Exhibit 9).

28. On or about November 30, 2001, Horst called Sankey and left a message on Sankey's answering machine that Rhodes would be in Baton Rouge the following week and would resolve the situation (See, "Notes of Telephone Conversation between Sankey & Shaw" attached hereto and incorporated herein as Exhibit 10).

29. On or about December 3, 2001, Horst called Sankey and left a message on Sankey's answering machine that – with or without resolution while in Baton

Rouge that week – Rhodes would send the final letter to Sankey when Rhodes returned to his Stoughton, Massachusetts Office (See, "Notes of Telephone Conversation between Sankey & Shaw" attached hereto and incorporated herein as Exhibit 11).

30.    On or about December 11, 2001, Horst called Sankey and stated that the final letter would be out "today or tomorrow", that Rhodes told him the delay was due to unrelated matters that took his attention, and that Horst was going on vacation and would return after the first of the year (See, "Notes of Telephone Conversation between Sankey & Shaw" attached hereto and incorporated herein as Exhibit 12).

31.    On or about January 7, 2002, Sankey sent an e-mail to Horst stating that it had been three months since they agreed on Sankey coming back to work at Shaw; that the final written letter had been agreed-upon more than two months ago; that Sankey was being tortured; and, that Sankey was being financially impacted (See, true copy of said e-mail attached hereto and incorporated herein as Exhibit 13).

32.    On or about January 8, 2002, Horst acknowledged Sankey's January 7, 2002 e-mail and asked Sankey to call him (See, true copy of said e-mail attached hereto and incorporated herein as Exhibit 14A).  Sankey telephoned Horst who said that he agreed with Sankey's January 7, 2002 e-mail and was totally embarrassed, but Horst insisted that it was not a dead issue.  Horst then suggested that they wait a few more weeks and Sankey agreed (See, "Notes of Telephone Conversation between Sankey & Shaw" attached hereto and incorporated herein as Exhibit

14B).

33.    On or about February 15, 2002, after waiting five more weeks without any word from Shaw, Sankey sent a letter to Rhodes stating that Sankey suffered damages caused by Shaw, and proposed a settlement (See, true copy of said correspondence attached hereto an incorporated herein as Exhibit 15A). At this time the Jacobs job was no longer available to Sankey. (See, true copy of September 5, 2004 Affidavit of Joseph D. Cleggett attached hereto and incorporated herein as Exhibit 15B.)

34.    On or about March 12, 2002, Rhodes sent a letter responding to Sankey in which he stated that Sankey was never offered a job and he therefore declined Sankey's offer of settlement (See, true copy of said correspondence attached hereto and incorporated herein as Exhibit 16).

35.    On or about March 29, 2002, Sankey's Attorney (at that time), Anthony A. Froio of Robins, Kaplan, Miller & Ciresi, sent a demand letter to Rhodes advising that Sankey was caused significant damage by Shaw and that unless Shaw made a reasonable offer of settlement, Sankey intended to commence formal proceedings against Shaw (See, true copy of said demand correspondence attached hereto and incorporated herein as Exhibit 17). Shaw called Attorney Froio, acknowledged receipt of Attorney Froio's demand letter, and stated that Shaw would respond in writing. However, Shaw never did respond to Attorney Froio's demand letter of March 29, 2002 in writing.

36.    As the direct and proximate result of the actions and conduct of the Defendants as

outlined in detail above, Sankey was clearly and compellingly led to reasonably believe that he had secured a lucrative position with the Defendants having been so assured by the Defendants – both actively and aggressively – on numerous occasions. Accordingly, Sankey – reasonably relying to his great detriment and harm upon the Defendants' negligent and/or intentionally coercive, unfair and deceptive course of conduct, and further being subjected to the Defendants' active domination of his will and their moral force and/or coercion upon him to act exactly and foreseeably just as he did – was not only deprived of the exceptional job opportunity he knew he had "secured" with the Defendants but also turned down and irrevocably rejected a highly lucrative, comparable position with Jacobs and accordingly has suffered and will continue to suffer great monetary damages and economic harm no less than One Million Seven Hundred and Fifty Thousand ($1,750,000.00) Dollars.

37.     Moreover, as a direct and proximate result of the intentional, coercive and unfair and deceptive course of conduct inflicted upon Sankey by the Defendants, Sankey has understandably suffered acute emotional and psychological pain and suffering which may be reasonably assessed – given the totality of the impact of the Defendants' conduct upon Sankey's quality of life – to be valued at no less than Two Hundred and Fifty Thousand ($250,000.00) Dollars.

38.     Presently Sankey continues his own consulting engineering business in the State of Massachusetts, furnishing services as a sole proprietor.

39.     Sankey's average income from his consulting engineering business for 2002

(actual), 2003 (actual) and 2004 (estimated) is approximately $56,000.00 per year.

40. Had Sankey accepted the Jacobs job opportunity, Sankey's annual compensation (income plus benefits) would have been approximately $180,000.00 per year.

41. Sankey diligently continues on an ongoing basis to look for other job opportunities more beneficial than his consulting engineering business, but to date has not secured any other such opportunities.

42. As a direct result of Shaw breaching its agreement and contract with Sankey, Sankey immediately lost $30,000.00, the value of his Shaw Sign-on Bonus. As a further result of Sankey's reasonable reliance on Shaw's promises, Sankey continues to suffer a loss of approximately $124,000.00 per year (i.e. – $180,000.00 less $56,000.00).

43. Sankey had intended to remain at Jacobs from October 31, 2001 until at least his normal retirement date of August 24, 2015, a period of 13.8 years, consistent with his history of service to one employer for his prior entire 27-year professional engineering career.

## COUNT I – DECEIT/FRAUD

44. The Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 43 with the same force and effect as though fully set forth herein.

45. By their improper, fraudulent and illegal acts complained of herein the Defendants misrepresented facts to the Plaintiff with the intention to induce the Plaintiff to act upon said misrepresented facts, said Defendants knew of the untruth of their

misrepresentations and further failed to disclose facts to the Plaintiff which they had a duty to disclose and said Defendants intended that their misrepresentations be acted upon by the Plaintiff as they were and the Plaintiff has sustained damages directly as a result of said misrepresentations in the amount of Two Million ($2,000,000.00) Dollars.

WHEREFORE, THE PLAINTIFF DEMANDS JUDGMENT AGAINST THE DEFENDANTS IN THE AMOUNT OF ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND ($1,750,000.00) DOLLARS IN ACTUAL MONETARY LOSSES AND TWO HUNDRED AND FIFTY THOUSAND ($250,000.00) DOLLARS FOR EMOTIONAL PAIN AND SUFFERING, OR, TWO MILLION ($2,000,000.00) DOLLARS TOGETHER WITH INTEREST AND ALL COSTS OF THIS ACTION.

## COUNT II - NEGLIGENT MISREPRESENTATION

46.     The Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 45 with the same force and effect as though fully set forth herein.

47.     By their improper, fraudulent, illegal and deceptive acts complained of herein, the Defendants negligently misrepresented facts to the Plaintiff with the intention and/or the obvious effect of inducing the Plaintiff to act upon said negligently misrepresented facts, said Defendants knew or should have known under all the facts and circumstances at bar of the untruth of their misrepresentations, and said Defendants further failed to disclose facts to the Plaintiff which they knew or should have known they had a duty to disclose, and said Defendant intended or

should have known that their misrepresentations would be acted upon by the Plaintiff precisely as they were, and the Plaintiff sustained damages as a result of said negligent misrepresentations in the amount of Two Million ($2,000,000.00) Dollars.

WHEREFORE, THE PLAINTIFF DEMANDS JUDGMENT AGAINST THE DEFENDANTS IN THE AMOUNT OF ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND ($1,750,000.00) DOLLARS IN ACTUAL MONETARY LOSSES AND TWO HUNDRED AND FIFTY THOUSAND ($250,000.00) DOLLARS FOR EMOTIONAL PAIN AND SUFFERING, OR, TWO MILLION ($2,000,000.00) DOLLARS TOGETHER WITH INTEREST AND ALL COSTS OF THIS ACTION.

## COUNT III - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

48.  The Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 47 with the same force and effect as though fully set forth herein.

49.  As the direct result of the Defendants' abusive, willful, callous, unfair, deceptive, outrageous and intentionally misleading conduct complained of herein, Sankey has inescapably suffered great economic losses and extreme and marked emotional and psychological distress.

WHEREFORE, THE PLAINTIFF DEMANDS JUDGMENT AGAINST THE DEFENDANTS IN THE AMOUNT OF ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND ($1,750,000.00) DOLLARS IN ACTUAL MONETARY LOSSES AND TWO HUNDRED AND FIFTY THOUSAND ($250,000.00) DOLLARS FOR EMOTIONAL PAIN

AND SUFFERING, OR, TWO MILLION ($2,000,000.00) DOLLARS TOGETHER WITH INTEREST AND ALL COSTS OF THIS ACTION.

## COUNT IV – UNLAWFUL/TORTIOUS INTERFERENCE WITH ADVANTAGEOUS OR CONTRACTUAL RELATIONSHIP

50.    The Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 49 with the same force and effect as though fully set forth herein.

51.    As the direct result of the Defendants' willful, knowing, intentional, improper and unlawful interference with the Plaintiff's contractual or other economic relationship with Jacobs and the Defendants' clear interference with the Plaintiff's prospective economic relationship with Jacobs, the Plaintiff has suffered great monetary damages and emotional distress.

WHEREFORE, THE PLAINTIFF DEMANDS JUDGMENT AGAINST THE DEFENDANTS IN THE AMOUNT OF ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND ($1,750,000.00) DOLLARS IN ACTUAL MONETARY LOSSES AND TWO HUNDRED AND FIFTY THOUSAND ($250,000.00) DOLLARS FOR EMOTIONAL PAIN AND SUFFERING, OR, TWO MILLION ($2,000,000.00) DOLLARS TOGETHER WITH INTEREST AND ALL COSTS OF THIS ACTION.

## COUNT V – CIVIL CONSPIRACY

52.    The Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 51 with the same force and effect as though fully set forth herein.

53.    The Defendants, in bad faith, and in an unfair, deceptive, fraudulent, corrupt and illegal manner combined to accomplish, and conspired together for, the purpose of achieving the economic and emotionally distressing result effected upon the Plaintiff by their unlawful combination and as a direct result thereof the Plaintiff has sustained damages in the sum of Two Million ($2,000,000.00) Dollars.

WHEREFORE, THE PLAINTIFF DEMANDS JUDGMENT AGAINST THE DEFENDANTS IN THE AMOUNT OF ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND ($1,750,000.00) DOLLARS IN ACTUAL MONETARY LOSSES AND TWO HUNDRED AND FIFTY THOUSAND ($250,000.00) DOLLARS FOR EMOTIONAL PAIN AND SUFFERING, OR, TWO MILLION ($2,000,000.00) DOLLARS TOGETHER WITH INTEREST AND ALL COSTS OF THIS ACTION.

### COUNT VI - BREACH OF CONTRACT

54.    The Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 53 with the same force and effect as though fully set forth herein.

55.    Notwithstanding the fact that the Plaintiff fully performed each and every task, duty or obligation required on his part pursuant to the agreement between himself and the Defendants, the Defendants without any excuse or justification materially breached the agreement and contract between the parties to the Plaintiff's great economic harm.

WHEREFORE, THE PLAINTIFF DEMANDS JUDGMENT AGAINST THE DEFENDANTS IN THE AMOUNT OF ONE MILLION SEVEN HUNDRED AND FIFTY

THOUSAND ($1,750,000.00) DOLLARS IN ACTUAL MONETARY LOSSES AND TWO HUNDRED AND FIFTY THOUSAND ($250,000.00) DOLLARS FOR EMOTIONAL PAIN AND SUFFERING, OR, TWO MILLION ($2,000,000.00) DOLLARS TOGETHER WITH INTEREST AND ALL COSTS OF THIS ACTION.

<u>COUNT VII - NEGLIGENCE</u>

56.    The Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 55 with the same force and effect as though fully set forth herein.

57.    As the direct and proximate cause of the negligence of the Defendants the Plaintiff was caused to sustain severe economic and monetary losses. The Defendants as complained of herein were negligent in their course of conduct with the Plaintiff; in leading the Plaintiff to reasonably believe that he had been hired by the Defendants; in allowing the Plaintiff to lose an extremely lucrative alternative economic job opportunity and package which the Defendants were well aware of; and, in their unfair and deceptive manner throughout in dealing with the Plaintiff – to his great harm.

WHEREFORE, THE PLAINTIFF DEMANDS JUDGMENT AGAINST THE DEFENDANTS IN THE AMOUNT OF ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND ($1,750,000.00) DOLLARS IN ACTUAL MONETARY LOSSES AND TWO HUNDRED AND FIFTY THOUSAND ($250,000.00) DOLLARS FOR EMOTIONAL PAIN AND SUFFERING, OR, TWO MILLION ($2,000,000.00) DOLLARS TOGETHER WITH INTEREST AND ALL COSTS OF THIS ACTION.

## COUNT VIII - BREACH OF THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING

58.    The Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 57 with the same force and effect as though fully set forth herein.

59.    By their improper, unfair, fraudulent, illegal and deceptive acts complained of herein, the Defendants breached the implied covenant of good faith and fair dealing between the parties by intentionally and unjustly controlling and manipulating Sankey to his great detriment and possibly – upon information and belief – to their apparent commercial/economic benefit and further breached the covenant of good faith and fair dealing between the parties in that their conduct – viewed in light of the totality of facts and circumstances at bar – violated a clearly established public policy in the commercial setting involved for which violation there is no other way to vindicate such/said public policy without providing to/for Sankey the full, fair and reasonable legal compensation and damages which Sankey is entitled to under said circumstances.

WHEREFORE, THE PLAINTIFF DEMANDS JUDGMENT AGAINST THE DEFENDANTS IN THE AMOUNT OF ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND ($1,750,000.00) DOLLARS IN ACTUAL MONETARY LOSSES AND TWO HUNDRED AND FIFTY THOUSAND ($250,000.00) DOLLARS FOR EMOTIONAL PAIN AND SUFFERING, OR, TWO MILLION ($2,000,000.00) DOLLARS TOGETHER WITH INTEREST AND ALL COSTS OF THIS ACTION.

## COUNT IX - VIOLATION OF THE MASSACHUSETTS CIVIL RIGHTS ACT, MASSACHUSETTS GENERAL LAWS CHAPTER 12 §§ 11H & I

60.     Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 59 with the same force and effect as though fully set forth herein.

61.     By their improper, deceptive, fraudulent, illegal, controlling, and manipulative conduct complained of herein, the Defendants interfered or attempted to interfere with one or more rights of Sankey secured by the United States Constitution and/or a right secured by the Constitution of the Commonwealth of Massachusetts, and the Defendants and said Defendants' interference, or attempted interference, was by and through economic and financial coercion exercised upon Sankey and/or the active domination of his will and use of moral force to compel Sankey to act foreseeably exactly as he did – all to his great economic and psychological detriment, causing Sankey damages in the amount of Two Million ($2,000,000.00) Dollars.

WHEREFORE, THE PLAINTIFF DEMANDS JUDGMENT AGAINST THE DEFENDANTS IN THE AMOUNT OF ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND ($1,750,000.00) DOLLARS IN ACTUAL MONETARY LOSSES AND TWO HUNDRED AND FIFTY THOUSAND ($250,000.00) DOLLARS FOR EMOTIONAL PAIN AND SUFFERING, OR, TWO MILLION ($2,000,000.00) DOLLARS TOGETHER WITH INTEREST AND ALL COSTS OF THIS ACTION.

## COUNT X - PROMISSORY ESTOPPEL

62. The Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 61 with the same force and effect as though fully set forth herein.

63. By their acts complained of herein, the Defendants consummated, effected and/or made a promise to Sankey which the Defendants reasonably should have expected to have induced action or forbearance of a definite and substantial character on the part of Sankey, the Defendants' promise did indeed induce just such foreseeable action or forbearance on the part of Sankey – who reasonably relied upon the Defendant representations communicated to him – and injustice can be avoided only by enforcement of the Defendants' promise made, or, payment to the Plaintiff of his reasonable damages so sustained in the amount of Two Million ($2,000,000.00) Dollars.

WHEREFORE, THE PLAINTIFF DEMANDS JUDGMENT AGAINST THE DEFENDANTS IN THE AMOUNT OF ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND ($1,750,000.00) DOLLARS IN ACTUAL MONETARY LOSSES AND TWO HUNDRED AND FIFTY THOUSAND ($250,000.00) DOLLARS FOR EMOTIONAL PAIN AND SUFFERING, OR, TWO MILLION ($2,000,000.00) DOLLARS TOGETHER WITH INTEREST AND ALL COSTS OF THIS ACTION.

## COUNT XI - ECONOMIC DURESS

64. The Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 63 with the same force and effect as

Page 22 of 26

though fully set forth herein.

65.    By their improper, fraudulent, controlling, coercive, manipulative, deceptive, unconscionable, unfair and wrongful acts complained of herein, the Defendants tortiously subjected Sankey to economic duress in that they purposely employed and levied their far superior bargaining power against/upon Sankey; Sankey was the target and the patently vulnerable victim of the Defendants' wrongful and unlawful acts and said Defendants' acts effectively deprived Sankey of his unfettered will under circumstances permitting no other, reasonable alternative course of action by Sankey than what transpired. As a direct result of these elements and circumstances, Sankey was coerced and compelled to make a disproportionate exchange of values, namely, rejecting a highly lucrative and career-enhancing job offer and opportunity with Jacobs in exchange for a job unconditionally guaranteed and promised by the Defendants which – in fact – never materialized. As a result of the economic duress which Sankey was subjected to as described herein, Sankey sustained severe economic, emotional and psychological damages in the amount of Two Million ($2,000,000.00) Dollars.

WHEREFORE, THE PLAINTIFF DEMANDS JUDGMENT AGAINST THE DEFENDANTS IN THE AMOUNT OF ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND ($1,750,000.00) DOLLARS IN ACTUAL MONETARY LOSSES AND TWO HUNDRED AND FIFTY THOUSAND ($250,000.00) DOLLARS FOR EMOTIONAL PAIN AND SUFFERING, OR, TWO MILLION ($2,000,000.00) DOLLARS TOGETHER WITH