UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

<u>CIVIL ACTION NO.: 04-12098</u>

| | |
|---|---|
| GREGORY F. SANKEY,<br>Plaintiff<br><br>v.<br><br>THE SHAW GROUP, INC. and<br>STONE & WEBSTER, INC.,<br>Defendants | **MEMORANDUM OF LAW IN<br>SUPPORT OF**<br><br>**DEFENDANTS' MOTION TO<br>DISMISS COUNT 12<br>PURSUANT TO RULE 12(b)(6)** |

This lawsuit arises out of Gregory F. Sankey's ("Sankey") failed efforts to procure a job from Stone & Webster, Inc. ("S&W") in 2001 and 2002. Sankey contends that S&W, a wholly owned subsidiary of The Shaw Group, Inc. (individually, "Shaw," or together with S&W, the "Defendants"), promised to hire him for an at-will position, and then reneged on its offer.

The Defendants now move to dismiss Count 12 (Violation of M.G.L.c. 93A) of Sankey's Amended Complaint (the "Amended Complaint") pursuant to Fed.R.Civ.P. 12(b)(6) as M.G.L. c. 93A does not apply to disputes arising from employment agreements or relating to the hiring or firing process, and accordingly, Count 12 of the Sankey's Amended Complaint fails to state claims upon which relief may be granted.

I.    **STATEMENT OF FACTS AS ALLEGED IN SANKEY'S COMPLAINT**

According to the Amended Complaint, Sankey was employed by Stone & Webster Engineering Corporation ("SWEC") from 1973 through 2000.[1]  See Amended Complaint at ¶6.  SWEC declared bankruptcy in the middle of 2000, and Shaw purchased SWEC's remaining assets. Id. at ¶9.  Shaw retained Sankey through the end of the year; however, Sankey's position was eliminated on December 31, 2000, and Shaw chose not to extend Sankey's employment. Id.

Sankey began looking for a full time job in January of 2001.  Id. at ¶10. Approximately nine months later, in September, 2001, Sankey spoke with one of SWEC's former vice-presidents, Thomas Horst ("Horst"), who informed Sankey that he had taken a position as Shaw's Vice President and Director of Shaw's E/I Division, and that he hoped to rehire Sankey for his management team. Id. at ¶12

During the same month, September of 2001, Sankey received an offer from another company, Sverdrup Civil, Inc. ("SCI"), to join that firm as its Boston Office Manager. Id. at ¶13.  Sankey and SCI agreed to meet again on October 11 to finalize compensation terms. Id.

On October 5, Sankey met with Horst to further discuss the possibility of Sankey's working for S&W. Id. at ¶14.  Sankey does not contend that Horst made any offer at that meeting, but rather asserts that Horst outlined generally what S&W's compensation terms would be should S&W hire Sankey.  Id.  On October 8, Sankey contacted SCI to discuss his possible compensation with that firm. Id. at ¶15.  Sankey apparently deemed the possibility of re-joining S&W to be preferable to the SCI offer,

---

[1] The Defendants dispute many of the facts alleged in Sankey's Amended Complaint; however, the Defendants adopt the facts alleged in the Amended Complaint for purposes of this motion.

and Sankey rejected SCI's offer. Id. Sankey rejected the SCI offer on October 8, 2001; however, Sankey does not allege that he received any offer from S&W until October 30, 2001. Id. at ¶¶15, 21.

On October 24, Horst's supervisor, Walter Rhodes ("Rhodes"), interviewed Sankey and allegedly stated that Horst would contact Sankey to finalize the terms of S&W's offer. Id. at ¶17. During the following week, Horst and Sankey continued to discuss and negotiate the terms of Sankey's employment, including the amount of Sankey's salary. Id. at ¶¶18-20.

According to the Amended Complaint, Horst made a job offer to Sankey on October 30, 2001 and Sankey accepted the position. Id. at ¶21. Horst emailed Sankey an unsigned "draft letter" for his review, containing the following terms:

- Sankey would be an at-will employee;
- Sankey's starting salary would be $185,000 per year;
- Sankey would receive a $30,000 signing bonus; and
- Sankey would have exclusive use of a company vehicle.

Id. at ¶22; also see Id. at Attachment 2; a copy of this document is also attached hereto as Exhibit A.

Notwithstanding the purported agreement, Sankey continued to negotiate over what type of company car he would receive. Id. at ¶¶23-24. Sankey contends that he and Horst ultimately agreed upon language for the offer letter, and that Horst informed him that he would need final approval from Shaw before could issue the offer letter. Id. at ¶¶26-28.

From November of 2001 through January of 2002, Sankey and Horst communicated regarding the potential offer, and Horst informed Sankey that he did not yet have approval from Shaw to issue the letter. Id. S&W ultimately elected not to hire Sankey and declined to provide Sankey with a final signed offer letter.

On February 15, 2002, Sankey sent a letter to Rhodes, seeking payment of $400,000 as damages for S&W's delay. Id. at Attachment 15, a copy of this document is also attached hereto as Exhibit B. Rhodes responded on March 12, 2002, denying that S&W had offered Sankey a job, and accordingly, responded that Sankey was not entitled to compensation from S&W. Id. at Attachment 16, a copy of this document is also attached hereto as Exhibit C.

## II.    STANDARD OF REVIEW

In considering a motion to dismiss, "[a] court's inquiry is a limited one, focusing not on whether the plaintiff will ultimately prevail but on whether the plaintiff should be entitled to offer evidence to support a claim." Canty v. Old Rochester Reg'l Sch. Dist., 54 F.Supp.2d 66, 68 (D.Mass.1999). A court should accept the well-pleaded complaint as true and indulge every reasonable inference in favor of the plaintiff. Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 52 (1st Cir.1990). This standard of review "does not mean, however, that a court must (or should) accept every allegation made by the complainant, no matter how conclusory or generalized." U.S. v. AVX Corp., 962 F.2d 108, 115 (1st Cir.1992). "[A] reviewing court is obliged neither to credit bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright vituperation, nor to honor subjective characterizations, optimistic predictions, or problematic suppositions.

Empirically unverifiable conclusions, not logically compelled, or at least supported, by the stated facts, deserve no deference." Id.

As set forth below, Count 12 of Sankey's Amended Complaint fails, even under this liberal standard, and accordingly, should be dismissed as a matter of law.

## III. SANKEY CANNOT SUSTAIN A CAUSE OF ACTION FOR VIOLATION OF c. 93A (COUNT 12)

Sankey cannot recover under the Massachusetts Consumer Protection Statute (M.G.L. c. 93A § 11) as the Supreme Judicial Court has expressly held that c. 93A does not apply to employment-related disputes. Manning v. Zuckerman, 388 Mass. 8, 13, 444 N.E.2d 1262, 1265 (1983). Further, Sankey's allegation that the Defendants committed a c. 93A violation by failing to respond to his settlement demands is misplaced, as the Defendants clearly stated their position in Rhodes's March 12, 2002 letter (a copy of which is attached to Sankey's Amended Complaint).

### A. An Employment Related Dispute Cannot Form the Basis of a c. 93A Claim

Massachusetts courts have consistently ruled that disputes arising from employment agreements *do not fall within the scope of c. 93A § 11*, as c. 93A only applies to acts committed while "engaged in trade or commerce." Informix v. Rennell, 41 Mass.App.Ct. 161, 668 N.E.2d 1351 (1996); See e.g. Dorfman v. TDA Industries, Inc., 16 Mass.App.Ct. 714, 455 N.E.2d 457 (1983); Manning v. Zuckerman, 388 Mass. 8, 444 N.E.2d 1262 (1983). "…[T]he *hiring* and firing of employees is not part of [a] company's commercial activities" and accordingly, c. 93A does not apply in such cases. See Manning, supra. at 13, 444 N.E.2d 1265 (italics supplied).

Chapter 93A applies only to behavior that occurs in the "conduct or trade of any commerce." See M.G.L. c. 93A §2. Under Massachusetts law, an entity is "engaged in trade or commerce" when it advertises or sells any property or services of kind offered generally by person for sale to public in business transaction. Trustees of Boston University v. ASM Communications, Inc., 33 F.Supp.2d 66 (1998). "Employees and employers are not engaged in trade and commerce with each other and as a result, disputes arising from an employment relationship between an employee and the organization that employs him, or between an employee and other members of that organization are not covered by the c. 93A remedies afforded in commercial transactions." Manning, supra. at 14, 444 N.E.2d 1265.

The hiring of an at-will employee does not constitute a "market place transaction" such that c. 93A would apply and govern the process. See e.g. Hope v. Double E Corp., 2001 WL 1334758 (Mass.Super., 2001). Rather, "...contract disputes between an employer and an employee ... are principally 'private in nature' and do not occur in the ordinary 'conduct of any trade or business' as contemplated by the statute." Manning, supra. at 14, 444 N.E.2d 1262.

In rejecting a cause of action for such relief, the Supreme Judicial Court noted that state and federal law already provides strong protections for prospective and current employees:

> In light of these comprehensive protections for employees and after ten years of existence of § 11, it would be somewhat surprising if we should now conclude that the Legislature intended that allegedly unlawful acts under G.L. c. 93A, § 2($a$), and § 11, also include matters arising from an employment relationship.

See Id. at 12.

Sankey's Amended Complaint fails to allege any facts supporting the "business" or "commerce" element of c. 93A, § 11. See First Enterprises, Ltd. v. Cooper, 425 Mass. 344, 347-348, 680 N.E.2d 1163 (1997) (a violation of § 11 requires proof that the acts complained of were perpetrated in a business context). Sankey's claim arises solely from his efforts to procure a job with S&W, and Massachusetts courts have expressly held that such activities do not qualify as trade or commerce for purposes of c. 93A. See Manning, supra. at 14, 444 N.E.2d 1262. Under these circumstances, Sankey is not entitled to relief under c. 93A, and accordingly, Count 12 must be dismissed as it fails to state a claim upon which relief may be granted.

**B.    Attorney Froio's March 29, 2002 Letter Cannot Create Liability Under c. 93A**

Sankey's claim that the Defendants violated c. 93A by not responding to Attorney Froio's March 29 letter is incorrect, as (a) Attorney Froio's letter was not a proper c. 93A demand; and (b) the Defendants had already responded to the same assertions and demands approximately three weeks before.

- **Attorney Froio's Letter was not a Proper c. 93A Demand**

The Defendants had no statutory obligation to respond to Attorney Froio's March 29, 2002 letter, as the letter was not a proper c. 93A demand. See Amended Complaint at Attachment 17, a copy of which is attached hereto as Exhibit D. In order to qualify as a c. 93A demand, a letter must specifically inform the prospective defendant that relief will be sought under c. 93A. Cassano v. Gogos, 20 Mass.App.Ct. 348, 480 N.E.2d 649 (1985). This can be accomplished by the letter's mentioning one of the following six factors: (1) an express reference to c. 93A; (2) an express reference to the Consumer Protection Act; (3) an assertion that the rights of the claimant as a consumer have been

7

violated; (4) an assertion that the prospective defendant has acted in an unfair or deceptive manner; (5) a reference that the claimant anticipates a settlement offer within 30 days; or (6) an assertion that the claimant will pursue multiple damages and legal expenses, if relief is denied by the prospective defendant. Id. at 351.

Attorney Froio's letter did not meet any of these criteria and gave no indication that the letter was intended to trigger the protections and penalties of c. 93A. The letter did not reference the statute or warn of the potential for double or treble damages thereunder, and did not state that a response was required within 30 days (as required under the statute), but instead demanded a response within two weeks, thus giving the impression that the letter was not intended as a c. 93A demand.

A letter which does not identify that it is intended to invoke c. 93A, cannot form the basis for liability under that statute. See MacKenzie v. Auto Supermart, Inc., 1998 Mass.App.Div. 5, 7; also see Hadar v. Concordia Yacht Builders, Inc., 886 F.Supp. 1082 (S.D.N.Y.1995) (applying Mass. law) (demand letter was inadequate because it did not inform defendants that plaintiff intended to seek relief under the Consumer Protection Act). The purpose of the statutory written demand is to encourage settlements and to apprise the defendants of the potential penalties facing them in litigation. That objective is not brought closer by keeping the nature of the action concealed. Id.

Attorney Froio's letter provided no indication that the letter was intended as a precursor to a c. 93A complaint. The letter did not identify any conduct as unfair or deceptive or warn of the possible recovery of multiple damages and attorneys' fees under the act. Under these circumstances, the letter does not qualify as a c. 93A demand, and Sankey cannot contend that the Defendants violated the statute by declining to respond.

8

- **Sankey Cannot Create Liability by Sending Repeated Letters Making the Same Demands**

Sankey alleges that the Defendants violated c. 93A by failing to respond to his attorney's March 29, 2002 letter; however, the Defendants had already responded to the same claims and demands in responding to Sankey's February 15, 2002 letter.

Sankey (and counsel) sent two letters, approximately six weeks apart, asserting that S&W had offered him a position, and demanding that the Defendants pay him $400,000 as compensation for their decision not to hire him. S&W responded to the first letter on March 12, 2002, denying that S&W had offered to hire Sankey, and declining Sankey's demand for payment, but declined to respond to the second, which merely echoed the allegations and demands of the first letter.

M.G.L.c. 93A does not contain any provision requiring a party to respond to multiple repetitive demands for payment within a short period of time, particularly where such demands do not qualify as c. 93A demand letters. See generally, M.G.L.c. 93A. The Defendants responded appropriately to Sankey's February 25, 2002 letter and apprised Sankey of their position on the issues raised therein. Sankey's March 29, 2002 letter did not contain any new claims or demands warranting a change in S&W's position. The Defendants decision not to respond to a second letter did not prejudice Sankey in any way, nor force Sankey to institute litigation to learn the Defendants' position. Accordingly, Sankey's claim that the Defendants refusal to respond to Attorney Froio's March 29, 2002 letter constitutes a c. 93A violation must fail.

9

## CONCLUSION

For the reasons set forth above, Count 12 of the Plaintiff's Amended Complaint fails to state any claim upon which relief may be granted. Accordingly, Count 12 of the Amended Complaint should be dismissed as a matter of law.

WHEREFORE, The Shaw Group, Inc. and Stone & Webster, Inc. respectfully request that this Honorable Court:

A.    Dismiss Count 12 of the Plaintiff's Amended Complaint;

B.    Award attorneys' fees and costs; and

C.    Order such other relief as this Court deems just and proper.

Respectfully submitted,

THE SHAW GROUP, INC. and STONE & WEBTER, INC.

By its attorneys:

Richard C. Nelson, Esquire (BBO # 653790)
Kenneth E. Rubinstein, Esquire (BBO # 641226)
Nelson, Kinder, Mosseau & Saturley, P.C.
99 Middle Street
Manchester, NH  03101
(603) 647-1800

## CERTIFICATE OF SERVICE

I, Kenneth E. Rubinstein, Esquire, hereby certify that the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss Count 12 Pursuant to Rule 12(b)(6) was this day forwarded to Anthony R. Bott, Esquire, 8 Beach Road, P.O. Box 1137, East Orleans, Massachusetts 02643, Counsel for Gregory Sankey.

Dated:  January 5, 2005                          By:_____

                                                      Kenneth E. Rubinstein, Esquire

**Gregory F. Sankey**

| | |
|---|---|
| **From:** | "thomas horst" <hjohnt@yahoo.com> |
| **To:** | "Gregory F. Sankey" <sankey@fastdial.net> |
| **Sent:** | Tuesday, October 30, 2001 5:53 PM |
| **Attach:** | gregs letter.doc |
| **Subject:** | try this |

greg please comment on this, its not been seen by anyone yet, so i have borrowed the wording

**Do You Yahoo!?**
Make a great connection at Yahoo! Personals.

ATTACHMENT 2
PAGE 1 of 3

Draft

November 1, 2001

Mr. Greg Sankey
43 Twiss Rd
Orleans, MA 02653

Dear Greg:

We appreciate your interest and wish to thank you for considering employment opportunities with us.  We are pleased to offer you the position of Vice President, Operations Environmental/Infrastructure as a Full-time Regular employee at a starting salary of $185,000 per year.  Other provisions of your employment include the following:

- Performance metrics will be established and mutually agreed upon not later than two (2) weeks after your start date.

- You will receive a $35,000 sign-on bonus in the form of a no interest loan, payable up front.  The loan will be forgiven in on the first annual anniversary date of your employment.

- Company seniority date reverts to original date of employment of 19xx with Stone & Webster for the purposes of eligibility of all benefits.

- You will have the use of a company leased vehicle to carry out your duties with our clients and projects that come under the duties of your position including all costs associated with the vehicle.

- Eligibility for Stock Options and Bonus Plan.

If you should accept this offer of employment, shortly after your arrival on your first day, you will participate in our employee orientation program during which, you will receive important information on Company policy and benefits and also complete all segments of the on-roll process.  To prepare you for your orientation, we've enclosed a summary of our benefits and worksheets for you to use to determine your contribution to certain benefit premiums.  Please review this information carefully so that during the orientation, we'll be able to answer any questions you might have, to help you make the correct enrollment decisions.

Since we are obligated by federal and state laws to obtain certain information on all employees, our offer of employment is contingent upon the completion of all segments of the on-roll process.  We have enclosed a document entitled *"On Your First Day of Employment"* to identify the items you would be required to bring with you on your report date to successfully complete all segments of the on-roll process.

Our Company policy calls for employees to execute a standard form of Agreement.  A sample copy of this Agreement is enclosed for your review and the terms and conditions of the Agreement necessarily become part of our offer.  We call particular attention to the provision

ATTACHMENT 2
PAGE 2 of 3

of the Agreement regarding the scheduling of any inventions, discoveries, or improvements, etc. that shall not be subject to the terms of the Agreement. If it is necessary for you to schedule any such inventions, discoveries or improvements, etc. as exclusions, the undersigned must be notified in writing by return mail. In the absence of such written notification, we will assume that no exclusions are involved and the Agreement will so provide when it is executed on the date your employment commences.

Our policy is to maintain a drug-free workplace, therefore it may be necessary for you to comply with screening programs designed to insure employee fitness to perform duties at, or on behalf of, client, nuclear or governmental facilities.

By accepting this offer, you agree that your employment with the company is "at-will" which means that either you or the company may terminate your employment and compensation with or without notice at any time and for any or no reason or cause.

Please advise us of your acceptance or declination of this offer of employment by signing one copy of this letter and returning it to my attention in the envelope provided or via fax at the number on the enclosed business card as soon as possible. If your decision is to accept our offer, also indicate your employment commencement date.

We look forward to your response.

Very truly yours,


Walter R. Rhodes
Senior Vice-President

Enclosures


Accepted By:

X _____ Date: _____

Employment Commencement Date: _____
(NOTE: Start date should be the 1st business day of a week.)

Declined By:

X _____ Date: _____

Reason (optional): _____


ATTACHMENT 2
PAGE 3 of 3

43 Twiss Road
Orleans, MA  02653

February 15, 2002

Mr. Walter R. Rhodes
Senior Vice President
The Shaw Group, Inc.
100 Technology Center Drive
Stoughton, MA  02072

Dear Mr. Rhodes:

As you know, Shaw contacted me in October 2001 and asked if I wanted to come back to work.  After a several discussions, Shaw offered, and I accepted, the position of Vice President of Environmental/Infrastructure Operations.  The agreed upon annual salary was $185,000. with a sign-on bonus of $30,000.

Since late October, Shaw has repeatedly told me that the offer was good and that the "official" letter will be in the mail "this week".  After several months of being strung along, during which time I turned down another job, it is clear that Shaw has breached its agreement with me.  As a result of my reliance on representations made by Shaw, I have been impacted financially and otherwise.  Therefore, I request that Shaw compensate me.

As a settlement, I propose that Shaw reimburse me $400,000. which is the sum of the sign-on bonus plus two years salary.

I would appreciate your attention to this matter at your earliest convenience.  If you wish to discuss the matter, please call me at 508-255-3396.

Sincerely,

Gregory F. Sankey

ATTACHMENT  15
PAGE  1 of 1

8545 United Plaza Boulevard
Baton Rouge, LA 70809
225.932.2500


**Shaw** The Shaw Group Inc.

March 12, 2002

Mr. Gregory F. Sankey
43 Twiss Road
Orleans, MA 02653

Dear Mr. Sankey:

This is in response to your February 12, 2002 letter, wherein you state that you had been offered a job at Shaw, and that Shaw breached such offer agreement. We adamantly deny that you were offered the position of Vice President of Environmental/Infrastructure Operations at Shaw in late 2001 (or early 2002) and therefore, we decline your offer of settlement.

Very truly yours,

Walter R. Rhodes
Senior Vice President

ATTACHMENT 16
PAGE 1 of 1

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

### ATTORNEYS AT LAW

ATLANTA

BOSTON

CHICAGO

LOS ANGELES

MINNEAPOLIS

NAPLES

ORANGE COUNTY

SAINT PAUL

WASHINGTON, D.C.

SUITE 1300
111 HUNTINGTON AVENUE
BOSTON, MASSACHUSETTS 02199-7610
TELEPHONE (617) 267-2300
FACSIMILE (617) 267-8288
www.rkmc.com

ANTHONY A. FROIO

March 29, 2002

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Mr. Walter R. Rhodes
Senior Vice President
The Shaw Group, Inc.
100 Technology Center Drive
Stoughton, MA  02072

      Re:    **Gregory F. Sankey**
             **Our File No. 070546-0000**

Dear Mr. Rhodes:

    This office represents Mr. Gregory F. Sankey ("Mr. Sankey") of 43 Twiss Road, Orleans, Massachusetts. Reference is hereby made to Mr. Sankey's letter to you dated February 15, 2002, as well as your response to that letter dated as of March 12, 2002.

    As you know, The Shaw Group Inc. ("Shaw") contacted Mr. Sankey in connection with his interest in returning to work at the former Stone & Webster last October, 2001. After numerous conversations between Mr. Sankey and Shaw's Vice President of Environmental/Infrastructure Division, Thomas Horst ("Mr. Horst"), Mr. Sankey was offered by Shaw, and he accepted the position of Vice President of Environmental/Infrastructure Operations. In fact, the parties even agreed upon an annual salary of $185,000.00, together with a sign-on bonus of $30,000.00.

    From October, 2001 until February, 2002, Mr. Horst repeatedly advised Mr. Sankey that an official letter of agreement would be forthcoming to him confirming the terms of his employment with Shaw shortly. Despite repeated representations and assurances to this effect, Shaw never forwarded

ATTACHMENT  17
PAGE  1  of  2

Mr. Walter R. Rhodes
March 29, 2002
Page 2

Mr. Sankey the confirming letter agreement of his employment. In fact, Mr. Sankey and Mr. Horst exchanged numerous electronic communications evidencing and confirming Shaw's offer of employment to Mr. Sankey, Mr. Sankey's acceptance of the same, and confirmation that a letter agreement would be sent to him promptly.

As a result of Mr. Sankey's reliance upon the numerous representations made by Mr. Horst on behalf of Shaw, Mr. Sankey was caused to forego other employment opportunities which are now no longer available to him. In specific, and as was known by Mr. Horst last October, Mr. Sankey had been offered a similar position of employment with Jacobs/Sverdrup, which he declined in reliance upon the representations and offer of employment made by Shaw which he accepted last October, 2001.

Mr. Sankey has been caused significant damage as a result of Shaw's unfair and deceptive practices in connection with this matter, as well as his reliance upon the representations made to him by Shaw which were apparently advanced in bad faith. Accordingly, demand is hereby made to Shaw for the payment to Mr. Sankey in the amount of $400,000.00, which sum represents two years of salary, plus the sign-on bonus, which Mr. Sankey would have received pursuant to the offer Shaw extended and he accepted to be employed by Shaw.

Unless a reasonable offer of settlement is forthcoming by Shaw to Mr. Sankey directed to me at the above address on or before Friday, April 12, 2002, Mr. Sankey intends to commence formal proceedings against Shaw in this matter. I suggest you give this matter your immediate attention, or refer it to Shaw's legal counsel for response forthwith.

Sincerely,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

Anthony A. Froio

AAF/smbi
cc: Mr. Gregory F. Sankey

ATTACHMENT 17
PAGE 2 of 2